Ashok Ramani (SBN 200020)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Tel:   (650) 752-2000
Fax:   (650) 752-2111
ashok.ramani@davispolk.com

Dana M. Seshens (NY SBN 4148128)
(*pro hac vice application forthcoming*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:   (212) 450-4000
Fax:   (212) 701-5800
dana.seshens@davispolk.com

*Attorneys for Plaintiff Pfizer Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PFIZER INC.,<br><br>Plaintiff,<br><br>- against -<br><br>CHUN XIAO LI and DOES 1-5,<br><br>Defendants. | Case No. 3:21-cv-01980-CAB-JLB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**<br><br>Judge: Cathy Ann Bencivengo |

# TABLE OF CONTENTS

P\ \ AGE

I.    INTRODUCTION ...................................................................... 1

II.   FACTUAL BACKGROUND ...................................................... 2

    A.   Pfizer's Development of Its COVID-19 Vaccine ................................. 3

    B.   Pfizer's Development of Its Monoclonal Medications ...................... 4

    C.   Ms. Li's Employment at Pfizer ........................................................ 5

    D.   Pfizer's Protection of Its Confidential Information ......................... 6

    E.   Pfizer's Investigation of Ms. Li's Suspicious Digital Activity .......... 8

    F.   Ms. Li Misappropriates Pfizer's Trade Secrets ............................. 10

    G.   Ms. Li Tries to Resign and Declines an Exit Interview, Giving Rise to This Lawsuit ............................................................ 11

III.  A TEMPORARY RESTRAINING ORDER IS WARRANTED ............... 13

    A.   Pfizer Is Likely to Succeed on the Merits of Its Claims ................... 14

        1.   Ms. Li Misappropriated the Pfizer Trade Secrets ..................... 14

            a.   The Pfizer Trade Secrets ............................................ 14

            b.   Misappropriation of the Pfizer Trade Secrets ............... 16

        2.   Ms. Li Breached the Confidentiality Agreement ..................... 18

    B.   Pfizer Will Suffer Irreparable Harm Absent Injunctive Relief ......... 18

    C.   The Balance of Hardships Tips Decidedly in Pfizer's Favor ............ 20

    D.   The Public Interest Favors Issuance of a Preliminary Injunction ...... 21

    E.   The Relief Requested Preserves the Status Quo ............................ 21

IV.   A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED *EX PARTE* WITHOUT NOTICE ............................................ 22

V.    CONCLUSION ........................................................................ 23

# TABLE OF AUTHORITIES

Page

**Cases**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)................................................................ 13

*Allstate Ins. Co. v. Rote*,
  No. 16-cv-01432, 2016 WL 4191015 (D. Or. Aug. 7, 2016) ............................. 22

*Arizona Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014)................................................................ 18

*Arkley v. Aon Risk Servs. Companies, Inc.*,
  No. 12-cv-1966, 2012 WL 12885707 (C.D. Cal. June 13, 2012)........................ 18

*Beckman Instruments, Inc. v. Cincom Sys., Inc.*,
  165 F.3d 914, 1998 WL 783774 (9th Cir. 1998) ..................................... 19

*BOKF, NA v. Estes*,
  923 F.3d 558 (9th Cir. 2019)................................................................ 13

*ESI Grp. v. Wave Six, LLC*,
  No. 17-CV-2293-TWR, 2021 WL 5206136 (S.D. Cal. Nov. 9, 2021)............... 14

*Farris v. Seabrook*,
  677 F.3d 858 (9th Cir. 2012)................................................................ 13

*Indep. Techs., LLC v. Otodata Wireless Network, Inc.*,
  No. 20-CV-72-RJC-CLB, 2020 WL 1433525 (D. Nev. Mar. 23, 2020)............. 19

*Int'l Ass'n of Plumbing & Mech. Officials v. Int'l Conference of Bldg. Officials*,
  No. 95–55944, 1996 WL 117447 (9th Cir. Mar. 15, 1996)................................ 19

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
  443 F.Supp. 3d 303 (E.D.N.Y. Mar. 9, 2020)...................................... 18

*Kraus USA, Inc. v. Magarik*,
  No. 17-cv-6541, 2020 WL 2415670 (S.D.N.Y. May 12, 2020)........................ 18

*MAI Sys. Corp. v. Peak Comput., Inc.*,
  991 F.2d 511 (9th Cir. 1993)................................................................ 16

*Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  No. 20-CV-10488, 2020 WL 7778037 (S.D.N.Y. Dec. 30, 2020) ..................... 21

*Rent-A-Center., Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991)...............................................................................19

*Shutterfly, Inc. v. ForeverArts, Inc.*,
    No. 12-cv-3671, 2012 WL 2911887 (N.D. Cal. July 13, 2012) .........................23

*Softketeers, Inc. v. Regal W. Corp.*,
    No. 19-cv-519-JVS-JDEx, 2019 WL 4418819 (C.D. Cal. May 6, 2019) ...........19

*Spring Design, Inc. v. Barnesandnoble.com, LLC*,
    No. 09-cv-05185, 2009 WL 10702160 (N.D. Cal. Dec. 1, 2009) .......................18

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)...............................................................................19

*Sun Distrib. Co., LLC v. Corbett*,
    No. 18-CV-2231-BAS, 2018 WL 4951966 (S.D. Cal. Oct. 12, 2018)...14, 15, 16, 21

*TGG Mgmt. Co. v. Petraglia*,
    No. 19-cv-2007-BAS, 2020 WL 209103 (S.D. Cal. Jan. 14, 2020) ..15, 17, 21, 22

*Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*,
    609 F.3d 975 (9th Cir. 2010)...............................................................................13

*WeRide Corp. v. Kun Huang*,
    379 F. Supp. 3d 834 (N.D. Cal. 2019) ................................................................16

*Zeetogroup, LLC v. Fiorentino*,
    No. 19-cv-458-JLS, 2019 WL 2090007 (S.D. Cal. May 13, 2019).........14, 15, 16

**Statutes**

18 U.S.C. § 1836.........................................................................................................1

**Rules**

Fed. R. Civ. 65 ...........................................................................................................1

S.D. Cal. Civ. R. 83.3 ...............................................................................................22

Plaintiff Pfizer Inc. ("Pfizer") respectfully submits this memorandum of points and authorities in support of its motion for an *ex parte* temporary restraining order and order to show cause for preliminary injunction pending arbitration of its trade-secret and breach-of-contract claims against defendant Chun Xiao (Sherry) Li.  *See* Fed. R. Civ. 65(a)–(b); 18 U.S.C. § 1836(b)(3)(A).

## I.   INTRODUCTION

Conventional wisdom says that the cover up is worse than the crime.  Pfizer is not yet sure whether that is the case here, and thus comes to this Court for expedited relief in support of arbitration.  What Pfizer can say for sure is that its soon-to-be former employee Chun Xiao (Sherry) Li uploaded over 12,000 files— including scores of confidential Pfizer documents—from her Pfizer-issued laptop to a personal Google Drive account and onto other personal devices.  Clarke Decl. ¶ 7.  Upon learning of Ms. Li's troubling conduct, Pfizer addressed it with her. Smith Decl. ¶ 9.  Although Ms. Li initially gave the appearance of cooperation, she instead misled Pfizer about what she took, how she took it, when and why she did it, and where those files (and possibly others) can be found today.  *Id.* ¶ 10; Clarke Decl. ¶ 14–15.  Indeed, Ms. Li went so far as to provide Pfizer's security team with a decoy laptop, leading Pfizer to believe that it was the one she used to download the 12,000 files from her Google Drive account.  *See* Clark Decl. ¶¶ 14–18.  Forensic analyses confirmed it was not, and Ms. Li (or some third party) likely remains in possession of the actual computer that contains those 12,000 files.  *See id.*

Ms. Li's conduct is all the more troubling because of her impending departure from Pfizer to begin employment with Xencor, Inc., a Pfizer competitor. Coleman Decl. ¶ 8.  Pfizer cannot stand idly by while Ms. Li's departure threatens further dissemination of its prized trade secrets.  Although the parties are obligated to arbitrate the merits of the underlying dispute, only preliminary relief from this

Court can maintain the status quo and ensure that Pfizer receives the benefits of the agreed-upon arbitral arrangement.

Under these circumstances, a temporary restraining order and order to show cause for preliminary injunction are warranted.  Pfizer is likely to succeed on the merits of its claims: Ms. Li has not only acquired over 12,000 files containing Pfizer confidential information using improper means, but there also is a significant risk that she will use and disclose the trade-secret information contained therein, particularly in light of her impending departure from Pfizer.  Ms. Li further has breached her confidentiality obligations to Pfizer by the same conduct.  Absent injunctive relief, Pfizer will suffer irreparable harm: among other harms, Pfizer will lose the value of its trade secrets forever—a loss that cannot be quantified—if they were disclosed to a competitor such as Xencor.  Finally, temporary injunctive relief would preserve the status quo pending arbitration, and should be granted *ex parte* to prevent Ms. Li from destroying evidence before the Court hears this Motion.

## II.   FACTUAL BACKGROUND

For over 150 years, Pfizer has been an industry leader in the development of vaccines and drugs for the treatment of life-threatening diseases.  As just one example, Pfizer has been at the forefront of the global effort to develop a vaccine for COVID-19.  Through hard work, ingenuity, perseverance, and billions of dollars in capital expense, Pfizer secured the first emergency-use authorization in the United States for its COVID-19 vaccine in December 2020.  Meyer Decl. ¶¶ 3– 6.  Pfizer's work related to COVID-19 and other debilitating diseases such as urothelial carcinoma, Merkel cell carcinoma, and non-small-cell lung cancer, to name but a few, saves tens of thousands of lives each year.

Success breeds imitation, and competitors have been trying to recruit Pfizer's employees relentlessly, especially during 2021.  The vast majority of Pfizer employees choose to remain at Pfizer, pleased to remain on a winning team

that recognizes individuals' efforts with generous compensation packages and advancement opportunities within Pfizer.  Not so for Ms. Li, who decided to leave Pfizer for a competitor believed to be Xencor, Inc.

Had Ms. Li chosen to leave Pfizer honorably, she would not be the subject of this Motion.  But she made a different choice: on her way out the door she transferred onto personal accounts and devices 12,000 files, scores of which contain Pfizer's confidential, proprietary, and trade-secret information ("Confidential Information"), and tried covering her tracks repeatedly.  Due to the sheer number of documents Ms. Li misappropriated, Pfizer has yet to understand the full scope of confidential information in her possession.  While Ms. Li possesses thousands of documents potentially related to numerous Pfizer vaccines, drugs, and other innovations, this motion focuses on Pfizer's COVID-19 vaccine and its avelumab and elranatamab monoclonal antibodies.

## A.  Pfizer's Development of Its COVID-19 Vaccine

As the COVID-19 pandemic spread globally, Pfizer decided that it had a moral and scientific imperative to develop and bring to the public a vaccine as quickly as possible.  Pfizer partnered with BioNTech to co-develop an mRNA-based coronavirus vaccine program, BNT162, aimed at preventing COVID-19 disease.  Meyer Decl. ¶ 3. The collaboration leverages Pfizer's expertise in vaccine research and development, regulatory capabilities, and global manufacturing and distribution network.  *Id.*  To date, Pfizer has invested over $2 billion of its own capital to develop its COVID-19 vaccine and has dedicated hundreds of Pfizer scientists, strategists, and other personnel to the COVID-19 vaccine effort.  *Id.* ¶ 4.

Beginning in March 2020, Pfizer conducted numerous clinical trials and made various regulatory submissions in collaboration with BioNTech, in an effort to obtain emergency use authorization for the vaccine from the Food and Drug Administration ("FDA").  *Id.* ¶ 6. The FDA so authorized the Pfizer-BioNTech COVID-19 vaccine on or about December 11, 2020, making it the first COVID-19

3

vaccine available to the general public.  *Id.*  The FDA has since fully approved the vaccine for individuals 16 and older and has extended emergency use authorization for children as young as five years old.  *Id.*  Needless to say, Pfizer's vaccine has been a medical and commercial success.  *Id.*

### B.   Pfizer's Development of Its Monoclonal Medications

The COVID-19 vaccine has rightfully garnered praise and recognition around the world, but it should not overshadow the important work Pfizer does in other fields.  For example, Pfizer is a world leader in the research and development of monoclonal antibodies that combat rare and debilitating diseases. *Id.* ¶ 7.

In general, a body's immune system attacks foreign substances by generating a large number of antibodies, which are proteins that bind to certain targets in the body such as antigens that cause infections.  *Id.* ¶ 8.  Once an antibody attaches to an antigen, it triggers the body's immune system to target and destroy cells containing that antigen.  *Id.*  A monoclonal antibody is an antibody made in a laboratory that is designed to bind to a specific antigen, such as an antigen on the surface of a particular cancer cell.  *Id.*  Once the monoclonal antibody binds to the cancer cell, the body begins targeting and destroying cells like it.  *Id.*  Monoclonal antibodies may also be designed to target immune system cells to increase their activity against cancer cells.  *Id.*

One of the greatest challenges with respect to developing monoclonal antibodies is identifying the right antigen to target.  *Id.* ¶ 9.  It takes years of research and development, trial and error work, and hundreds of millions of dollars in investment capital to investigate a potential new monoclonal antibody.  *Id.*  Most investigational monoclonal antibodies turn out to be failures, and the few that make it past early phase studies require even more resources and capital to bring to market.  *Id.*  Simply stated, finding the right antigen to target and developing a compatible monoclonal antibody requires absolute precision; anything short of that would fail to improve patients' health and could even prove fatal.  *Id.*

In 2014, Pfizer entered into an agreement with Merck KGaA to co-develop avelumab, a groundbreaking monoclonal antibody now sold under the tradename Bavencio.  *Id.* ¶ 10.  Avelumab is FDA-approved to treat a specific type of cancer in the bladder or urinary tract called urothelial carcinoma (UC) when it has spread or cannot be removed by surgery.  *Id.*  It is also approved for patients with a rare and aggressive form of skin cancer called Merkel cell carcinoma.  *Id.*  Pfizer is currently researching whether avelumab could treat other forms of cancer, and whether avelumab could be effectively combined with other drugs.  *Id.*  Pfizer has invested over millions of dollars in the research and development of avelumab and as a direct result has saved countless lives.  *Id.*

Following in the footsteps of avelumab, Pfizer scientists discovered and began developing elranatamab, a bispecific monoclonal antibody.  *Id.* ¶ 11.  Bispecific monoclonal antibodies are antibodies that can simultaneously bind to two different types of antigens or two different target sites on the same antigen.  *Id.*  Pfizer scientists believe elranatamab could be effective in treating multiple myeloma, a rare blood cancer that affects plasma cells made in the bone marrow.  *Id.*  There is currently a high unmet medical need for treating multiple myeloma, and Pfizer is in a race with its competitors to develop more advanced treatments.  *Id.*  Recently, the FDA granted elranatamab Fast Track Designation, which is a process designed to facilitate the development, and expedite the review, of new drugs and vaccines that are intended to treat or prevent serious conditions that have the potential to address an unmet medical need.  *Id.*  To date, Pfizer has invested millions of dollars in the research and development of elranatamab, as it hopes elranatamab will prove to be the company's next blockbuster drug.  *Id.*

### C.  Ms. Li's Employment at Pfizer

On August 2, 2006, Pfizer hired Ms. Li as Associate Director of Statistics in Pfizer's Global Product Development ("GPD") group based in China.  Smith Decl.

MPA ISO TRO & OSC RE PI

¶ 4.  On or around August 22, 2016, Ms. Li transferred to Pfizer's facility in La Jolla, California and continued her role as Associate Director of Statistics.  *Id.*

Pfizer's GPD group is responsible for evaluating drug efficacy and safety in human clinical trials to obtain regulatory approval for drugs.  Meyer Decl. ¶ 12. Given her role as Associate Director of Statistics, Ms. Li had access to Pfizer's Confidential Information related to numerous vaccines and medications, including the COVID-19 vaccine, avelumab, and elranatamab.  *Id.* ¶ 14.

GPD employees are well aware of their obligations to safeguard Pfizer confidential information.  *Id.* ¶ 13.  In addition to supervisors constantly issuing reminders about confidentiality, Ms. Li was required to take training courses on maintaining the confidentiality of Pfizer information.  *Id.*; Smith Decl. ¶ 6.  For example, Ms. Li was required to take a course titled "Collaborate Securely: Safeguarding Sensitive Pfizer Information" that detailed the importance of safeguarding Pfizer confidential information.  Smith Decl. ¶ 7.  Ms. Li took this training three times in the last five years, on April 17, 2020, May 8, 2018, and January 20, 2017.  *Id.*  Ms. Li also took required trainings on the "Blue Book," the Pfizer employee code of conduct, on February 16, 2021, February 13, 2019, April 18, 2017, and November 23, 2016.  *Id.* ¶ 8.  This training included reminders about Pfizer's corporate policies regarding safeguarding sensitive information.  *Id.*

In addition, as part of her employment with Pfizer, Ms. Li entered into a Confidentiality Agreement, which imposed a number of restrictions on Ms. Li's activities during and after her employment.  *Id.* ¶ 5.  For example, by virtue of executing the Confidentiality Agreement, Ms. Li agreed not to "disclose or use any Confidential Information" without Pfizer's written permission, other than in the course of her employment with Pfizer.  *Id.*

## D.    Pfizer's Protection of Its Confidential Information

Pfizer uses its Confidential Information in connection with Pfizer's business, products, and services, including its development, manufacture, and sale of drugs

and vaccines.  Pfizer's Confidential Information gives Pfizer a substantial competitive advantage over its existing and would-be competitors, including Xencor, due to the significant investment of time, money, and resources in developing drug and vaccine programs, as well as the overall business strategy and business plans for such programs, drugs, and vaccines.  *See* Meyer Decl. ¶ 20.

Pfizer employs a set of robust measures to protect its intellectual property.  Those measures include employing a dedicated team of in-house forensics specialists, tracking employee activity on company devices, and using automated monitoring alerts to escalate suspicious employee activity.  Coleman Decl. ¶ 5.

Additionally, Pfizer employs a variety of data-security measures, including policies, agreements, and blocks on certain activity.  *Id.* ¶ 6.  For example, Pfizer's corporate policy, entitled Global Acceptable Use of Information Systems Policy #403, prohibits "unauthorized . . . disclosure, transfer, use or unapproved release of Pfizer Information," the use of "unauthorized devices (e.g. personal/home computers and laptops, public computers, etc.) . . . to transmit, store or work on Pfizer Information," and the "[u]nauthorized use of non-Pfizer cloud service accounts for the storage, computation or transfer of Pfizer information."  *Id.*  In furtherance of this policy, in October 2021, Pfizer implemented a technology that monitors when employees upload files to cloud-based platforms such as Google Drive.  *Id.*  And in 2019, Pfizer disabled USB access on all company laptops to prevent unauthorized transfer of Pfizer files onto external hard drives. *Id.*

Moreover, Pfizer conducts periodic trainings designed to ensure that employees are aware of the policies and expectations around data security.  Smith Decl. ¶ 6.  These trainings include an overview on the "Blue Book," the Pfizer employee code of conduct, and additional training on the company's acceptable use and handling sensitive information policies on how to protect and appropriately share Pfizer information.  *Id.*  Pfizer also requires employees to sign, as a condition

of employment, agreements obligating employees to protect Pfizer's confidential documents, information, trade secrets, and intellectual property. *Id.* ¶ 5.

### E.   Pfizer's Investigation of Ms. Li's Suspicious Digital Activity

As part of Pfizer's tracking of employee activity on company devices, Pfizer's security team discovered on October 29, 2021, that, between Saturday, October 23, 2021 and Tuesday, October 26, 2021, Ms. Li transferred over 12,000 files from her Pfizer laptop to an online Google Drive account.  Coleman Decl. ¶ 7; Smith Decl. ¶ 9.  Ms. Li was "out of the office" on October 25–26, but, unbeknownst to Pfizer, she was conducting mass transfers of files from her Pfizer laptop to her Google Drive account during that time.  Coleman Decl. ¶ 8.  Pfizer immediately initiated a digital review of Ms. Li's emails, her file access, and her internet activity on her Pfizer-issued laptop.  *Id.* ¶ 7.  An investigation into Ms. Li's Pfizer email account revealed that she had been interviewing with and had received an offer of employment from Xencor.  *Id.* ¶ 8.

Pfizer human-resources, security, and digital-forensics personnel spoke with Ms. Li twice on Friday, October 29, 2021.  *Id.* ¶ 10; Smith Decl. ¶ 9.  During the first conversation by phone with Pfizer human-resources and security personnel, Ms. Li admitted to having transferred the files and claimed that she did so because she wanted to organize her files offline and have them for her own personal use. Smith Decl. ¶ 9.  Ms. Li represented that she had transferred the files from the Google Drive onto an external hard drive using her personal laptop and had not copied the files elsewhere.  *Id.*

A couple of hours later, Pfizer's digital-forensics personnel had a second conversation with Ms. Li via videoconference.  Coleman Decl. ¶ 10.  Between the two conversations, Ms. Li had apparently logged onto her Google Drive account and deleted all of the files saved there.  *Id.*  After Ms. Li disclosed that she had deleted these files, Pfizer personnel asked Ms. Li to come to Pfizer's La Jolla office on Monday, November 1, and turn over her external hard drive and personal

laptop for inspection.  *Id.* ¶¶ 9–10.  Ms. Li expressed reluctance to provide her personal laptop, explaining that it contained personal information, but ultimately agreed to do so.  *Id.* ¶ 11; Smith Decl. ¶ 10.  Later that night, Pfizer personnel deactivated Ms. Li's Pfizer system access, her laptop, and her badge.  Coleman Decl. ¶ 11.

On November 1, 2021, Ms. Li came in to Pfizer's offices in La Jolla to return her Pfizer-issued laptop.  Smith Decl. ¶ 10.  Ms. Li also provided a personal laptop that she led Pfizer to believe was the one she used to download the Pfizer documents from her Google Drive account onto her external hard drive, as well as the external hard drive itself.  *Id.* Pending completion of Pfizer's forensic analyses of the devices, Pfizer placed Ms. Li on paid administrative leave.  *Id.*

The forensic examination of Ms. Li's devices revealed that Ms. Li had not been truthful with Pfizer.  Specifically, the forensic examination showed that Ms. Li downloaded the 12,000 files to a folder having a file path "C:\Users\cli\Downloads."  Clarke Decl. ¶ 12.  This is the Downloads folder associated with a user having a user profile "cli," which coincides with Ms. Li's first initial and last name.  *Id.*  No such user profile or folder exists on Ms. Li's Pfizer-issued laptop, the personal laptop she provided Pfizer, or the external hard drive.  *Id.* ¶ 17.  In the opinion of the experienced forensics analyst who conducted the analysis, the most likely explanation for this discrepancy is that Ms. Li provided Pfizer with a personal laptop ***other than*** the one she used to download the 12,000 files.  *Id.* ¶ 18.  The forensics analysis also revealed that the laptop Ms. Li had provided to Pfizer was hardly used during the week of October 25 when the downloads occurred, corroborating that she most likely used a different laptop to initiate the downloads.  *Id.* ¶ 15.  This conduct casts doubt on Ms. Li's truthfulness but, far more troublingly for Pfizer, indicates that another, unknown laptop likely contains the 12,000 files she downloaded, which include scores of Pfizer confidential documents such as the examples below.

MPA ISO TRO & OSC RE PI

The forensic examination also showed that a significant number of Pfizer documents were deleted from her external hard drive prior to turning it in.  *Id.* ¶ 16.  Specifically, forensic examination showed that hundreds of files and folders having Pfizer-related names were deleted the night of Saturday, October 30, 2021. *Id.*  She turned the hard drive over to Pfizer on Monday, November 1, 2021 without mentioning anything about these deleted files.

**F.    Ms. Li Misappropriates Pfizer's Trade Secrets**

Ms. Li has misappropriated Pfizer's Confidential Information concerning a broad range of topics, including information regarding Pfizer's COVID-19 vaccine and monoclonal antibody programs.  Meyer Decl. ¶ 15.  Pfizer's investigation of the more than 12,000 files is ongoing, but below are some examples of documents (the "Pfizer Trade Secrets") Ms. Li misappropriated that contain such highly sensitive information:

- A September 24, 2021 presentation titled "E2E Clinical Development + Submissions Playbook" ("E2E Submissions Playbook") that reflects, among other things, Pfizer's analysis of the successes and breakthroughs of Pfizer's COVID-19 vaccine study, end-to-end recommendations based on the COVID-19 study, analysis concerning why the Pfizer and BioNTech relationship was successful compared to other partnerships, and the identification of critical data variables for drug studies and ways to manage them.  *Id.* ¶ 16.

- A February 21, 2021 presentation titled "Pfizer Oncology Virtual Hematology Franchise Year Beginning Meeting" ("Virtual Hematology Presentation") that contains, among other things, operational goals, key achievements and key goals for various drugs, development plans and timelines, key next steps for elranatamab, clinical development overview for elranatamab, and key strategies for various drugs including elranatamab.  *Id.* ¶ 17.

10

- A July 6, 2021 "Clinical Development Plan Document" ("Clinical Development Plan") detailing development plans for combining encorafenib and binimetinib to treat melanoma.  The document discusses Pfizer's clinical development strategy, rationales, target product profiles, key elements of statistical analysis, global strategy, pediatric strategy, timelines, as well as a plethora of other highly sensitive trade secrets and confidential information. *Id.* ¶ 18.

- A February 20, 2019 presentation titled "Avelumab Case Study – Implementation of BLRM in Oncology Dose Finding Trials with Multiple Drug Combinations" ("Avelumab Case Study"), which discusses Pfizer's approach to implementing the Bayesian Logistic Regression Model in studies with multiple drug combination, challenges in designing Phase 1 drug combination studies, dosing strategies for drug combinations, implementation issues, and specifics related to the design and decision processes related to Pfizer's Phase 1 avelumab studies. *Id.* ¶ 19.

Pfizer did not authorize Ms. Li to transfer the aforementioned Pfizer files to her personal Google Drive account, and Pfizer is not aware of any legitimate business purpose for these transfers.  *See id.* ¶ 14.

### G. Ms. Li Tries to Resign and Declines an Exit Interview, Giving Rise to This Lawsuit

While Pfizer was conducting its investigation, Ms. Li notified Pfizer on November 16, 2021 that she was leaving the company and that her last day at Pfizer would be November 24, 2021.  Smith Decl. ¶ 11.  She refused to disclose the reason for her departure, including whether she had a new employer.  *Id.* ¶ 11. As discussed above, Pfizer's investigation of Ms. Li's Pfizer email account showed that Ms. Li had received an offer to start at Xencor on November 29, 2021. Coleman Decl. ¶ 8.

11

Pfizer decided to give Ms. Li a final opportunity to come clean.  It asked Ms. Li to come in for a meeting on Monday, November 22, 2021, to answer some follow up questions to better understand the pathways that she used to transfer the 12,000 files at issue.  Smith Decl. ¶ 12.  Pfizer expressed that it would appreciate Ms. Li's cooperation in making sure Pfizer's confidential information does not fall into the hands of any of its competitors, including her potential new employer Xencor.  *Id.*  Ms. Li declined to meet with Pfizer, stating that she had already provided Pfizer all the information it requested and citing health issues.  *Id.*

Given that Ms. Li is leaving Pfizer to start work for a competitor, possibly in less than a week, that Ms. Li has lacked candor and affirmatively misled Pfizer personnel, and that she appears to remain in possession of Pfizer trade-secret and confidential information, Pfizer has no choice but to commence this action and seek a temporary restraining order against her.  Indeed, Ms. Li acknowledged in her signed Confidentiality Agreement that "any breach by me of my obligations under this agreement . . . would cause irreparable harm to the Company, and that in the event of such breach the Company shall have . . . the right to an injunction, specific performance and other equitable relief to prevent violations of my obligations hereunder."

Pfizer asserts claims against Ms. Li for: (a) misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq.*; (b) breach of contract; (c) conversion; and (d) trespass to chattel. Pursuant to Ms. Li's Confidentiality Agreement, Pfizer intends to promptly commence arbitration proceedings once the status quo is preserved.[1]

---

[1]  The Confidentiality Agreement further provides that "[d]isputes arising under this Agreement will be subject to the Mutual Arbitration and Class Waiver Agreement." Ex. 1 (Confidentiality Agt.) ¶ 8.  However, the Mutual Arbitration and Class Waiver Agreement provides that "[e]ither party to this Agreement may make application to a court for temporary or preliminary injunctive relief in aid of

12

### III.   A TEMPORARY RESTRAINING ORDER IS WARRANTED

"[A] district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process—provided, of course, that the requirements for granting injunctive relief are otherwise satisfied." *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010). Here, Pfizer and Ms. Li have agreed to arbitrate all claims "arising out of and/or directly or indirectly related to" Ms. Li's employment with Pfizer, including "claims relating to breach of contract" and "any other claim under any federal . . . statute . . . or common law." Ex. 2 (Arb. Agt.) ¶ 1.

Courts apply the same standard for injunctions to preserve the status quo pending arbitration and preliminary injunctions generally. *See Toyo*, 609 F.3d at 982. "To obtain a preliminary injunction, a plaintiff must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *BOKF, NA v. Estes*, 923 F.3d 558, 561–62 (9th Cir. 2019) (internal quotations omitted). The Ninth Circuit applies a "sliding scale" approach, according to which "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (quoting *Cottrell*, 632 F.3d at 1135). As set forth herein, Pfizer has satisfied each of these elements.[2]

---

arbitration or for the maintenance of the status quo pending arbitration." Ex. 2 (Mutual Arb. Agt.) ¶ 1.

[2] Although Pfizer seeks a temporary restraining order and a preliminary injunction, the standard for entry of a TRO in this Circuit is the same as for entry

13

### A.     Pfizer Is Likely to Succeed on the Merits of Its Claims

Pfizer is likely to succeed on the merits of its claims that Ms. Li has misappropriated the Pfizer Trade Secrets under the DTSA and CUTSA and that she has breached the parties' Confidentiality Agreement.

#### 1.     Ms. Li Misappropriated the Pfizer Trade Secrets

The elements of trade-secret misappropriation under the DTSA and CUTSA are "essentially the same."  *ESI Grp. v. Wave Six, LLC*, No. 17-CV-2293-TWR, 2021 WL 5206136, at *3 (S.D. Cal. Nov. 9, 2021).  These include "(1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret."  *Sun Distrib. Co., LLC v. Corbett*, No. 18-CV-2231-BAS, 2018 WL 4951966, at *3 (S.D. Cal. Oct. 12, 2018) (citing 18 U.S.C. § 1836).

##### a.     The Pfizer Trade Secrets

Under both the DTSA and CUTSA, "all forms and types of financial, business, scientific, technical, economic, or engineering information" can qualify as a trade secret, so long as: (1) "the owner thereof has taken reasonable measures to keep such information secret"; and (2) "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  *Zeetogroup, LLC v. Fiorentino*, No. 19-cv-458-JLS, 2019 WL 2090007, at *3 (S.D. Cal. May 13, 2019) (citing 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d)).

Pfizer has identified four examples of Pfizer Trade Secrets (among numerous others sure to be found following a complete investigation into the documents misappropriated by Ms. Li), each of which qualifies for trade-secret protection and relates to Pfizer's COVID-19 vaccine and/or monoclonal antibody programs.  *See supra* Section II.F.  The E2E Submissions Playbook contains highly confidential analyses of Pfizer's COVID-19 vaccine studies as well as end-to-end

of a preliminary injunction.  *Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1092 (N.D. Cal. 2012).

recommendations based on those studies.  Meyer Decl. ¶ 16; *see generally* Ex. 3. The Virtual Hematology Presentation discloses Pfizer's operational goals, clinical development strategies and timelines, and key steps, goals, and strategies for various drugs.  Meyer Decl. ¶ 17; *see generally* Ex. 4.  The Clinical Development Plan describes Pfizer's development plans for combining monoclonal antibodies to treat melanoma, including target product profiles, key elements of statistical analysis, global strategy, pediatric strategy, and timelines.  Meyer Decl. ¶ 18; *see generally* Ex. 5.  The Avelumab Case Study discusses Pfizer's approach to implementing the Bayesian Logistic Regression Model in studies with multiple drug combinations, including dosing strategies, implementation issues, and design and decision processes.  Meyer Decl. ¶ 19; *see generally* Ex. 6.

These documents and types of information constitute trade secrets under the DTSA and the CUTSA.  *See, e.g.*, *TGG Mgmt. Co. v. Petraglia*, No. 19-cv-2007-BAS, 2020 WL 209103, at *4–5 (S.D. Cal. Jan. 14, 2020) (finding that "[q]uality assurance materials," "[p]roprietary sales and marketing materials," "[t]raining materials," and "financial models, templates, and statements" can constitute protected trade secrets); *Zeetogroup*, 2019 WL 2090007, at *3 (holding that plaintiff sufficiently identified a list of its "advertising campaigns and all of the associated metrics of the campaign" as a protectable trade secret).

Pfizer employs a variety of measures to protect the Pfizer Trade Secrets, including, among others, employing a dedicated team of in-house forensics specialists, tracking employee activity on company devices, and using automated monitoring alerts to escalate suspicious employee activity.  *See* Coleman Decl. ¶ 5. Pfizer further requires employees to sign confidentiality agreements, participate in periodic data security trainings, and abide by various data-security restrictions on their devices, among other measures.  *Id.* ¶ 6.  Under these circumstances, Pfizer more than adequately guards its Trade Secrets from disclosure.  *See, e.g.*, *Corbett*, 2018 WL 4951966, at *4 (finding trade secrets adequately pled where plaintiff

15

restricted access to the trade secrets via employee confidentiality agreements and a network security system); *Zeetogroup*, 2019 WL 2090007, at *4 (finding employer took adequate steps to protect its trade secret through the use of "Proprietary Information and Inventions Assignment Agreements" and password protection).

The Pfizer Trade Secrets also have significant economic value, particularly because they are not known or ascertainable by those who could leverage them. If disclosed, they would provide a competitor such as Xencor with substantial guidance as to how Pfizer develops and assesses its vaccines and drugs, including for both its COVID-19 vaccine and monoclonal antibody programs. Meyer Decl. ¶¶ 16, 20. Such guidance is the result of considerable investment by Pfizer: for example, Pfizer has invested over $2 billion of its own capital to develop its COVID-19 vaccine, and has dedicated hundreds of Pfizer scientists, strategists, and other personnel to the COVID-19 vaccine effort. *Id.* ¶ 4. *See, e.g.*, *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (finding plaintiff's customer database qualified as a trade secret in part because of its "potential economic value" to plaintiff's competitors); *see also WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. 2019) (finding trade secrets adequately pled where source code required "investments of over $45 million" to develop). Pfizer also invests millions of dollars into investigating each potential new monoclonal antibody drug. Meyer Decl. ¶¶ 10-11.

### b.    Misappropriation of the Pfizer Trade Secrets

Misappropriation is "nearly identical" under the DTSA and CUTSA, defined as (1) "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or (2) "[d]isclosure or use of a trade secret of another without express or implied consent" by a person who used improper means to acquire the trade secret or had knowledge it was improperly acquired. *Corbett*, 2018 WL 4951966, at *5.

Ms. Li misappropriated the Pfizer Trade Secrets.  Between Saturday, October 23, 2021 and Tuesday, October 26, 2021, Ms. Li transferred over 12,000 files from her Pfizer laptop to an online Google Drive account.  Coleman Decl. ¶ 8. Ms. Li was "out of the office" on October 25–26, but, unbeknownst to Pfizer, she was conducting mass transfers of files from her Pfizer laptop to her Google Drive account during that time.  *Id.*  These actions constituted improper acquisition of the Pfizer Trade Secrets, as they were in clear violation of the Confidentiality Agreement and company policies.  Ms. Li did not transmit these documents in the course of her work for Pfizer.  *See Petraglia*, 2020 WL 209103, at *2, *5 (finding improper acquisition adequately alleged where forensic analysis of former employees' laptops revealed one defendant "connected a personal external USB storage device to his [work] laptop and accessed various files" and sent "various [work] materials" to his personal email account).

Given the nature of the Trade Secrets, the timing of their transmission, and Ms. Li's apparent imminent plan to work for Xencor, there is significant risk that Ms. Li used and/or disclosed Pfizer's Confidential Information contained within the documents in her interviews with Xencor or in interviews or discussions with other third parties.  Indeed, it appears Ms. Li continues to retain the laptop that she used to transfer the 12,000 Pfizer files to this day.  Clarke Decl. ¶ 18.  Pfizer does not yet know if any use and/or disclosure occurred, but, to the extent that it did, that would provide another basis for Ms. Li's liability under the trade-secret laws. *See Petraglia*, 2020 WL 209103, at *6 (finding that defendant "used" plaintiff's trade secrets where defendant stored nearly identical copies of plaintiff's Excel workbooks on its own computers).

Accordingly, Pfizer is likely succeed on the merits of its DTSA and CUTSA claims.

MPA ISO TRO & OSC RE PI

### 2.     Ms. Li Breached the Confidentiality Agreement

To prevail on a breach of contract claim under New York law, a plaintiff must show "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contract obligations, and damages resulting from the breach."[3]  *Kraus USA, Inc. v. Magarik*, No. 17-cv-6541, 2020 WL 2415670, at *18 (S.D.N.Y. May 12, 2020).  Here, Ms. Li entered into the Confidentiality Agreement with Pfizer in August 2016.  Smith Decl. ¶ 5.  In exchange for compensation and other benefits that Pfizer provided to her, *see id*., Ms. Li agreed not to "disclose or use" Pfizer's "secret or confidential information and/or trade secrets" without its written permission, Ex. 1 (Confidentiality Agt.) ¶ 1.  Yet as discussed in Section III.A.1.b, *supra*, Ms. Li "uploaded [Pfizer] documents for her own personal reference" and sought to "rearrange and organize her Pfizer documents" for non-business purposes.  Smith Decl. ¶ 9.  Thus, Pfizer is likely to succeed on its breach of contract claim as well.  *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F.Supp. 3d 303, 337 (E.D.N.Y. Mar. 9, 2020) (finding likelihood of success on breach of contract claim where employer had a "legitimate interest in enforcing the confidentiality provision in [the] Employment Agreement . . . in order to prevent the use and disclosure of its confidential and proprietary information").

### B.     Pfizer Will Suffer Irreparable Harm Absent Injunctive Relief

To establish irreparable harm, a plaintiff must demonstrate that it is likely to suffer a harm "for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Accordingly, while "economic injury alone does not support a finding of

---

[3] New York law applies only to Pfizer's breach of contract claim due to the narrow choice-of-law provision in the parties' Confidentiality Agreement. *See Spring Design, Inc. v. Barnesandnoble.com, LLC*, No. 09-cv-05185, 2009 WL 10702160, at *3 (N.D. Cal. Dec. 1, 2009).  California law applies to Pfizer's state trade-secret misappropriation claim. *See Arkley v. Aon Risk Servs. Companies, Inc.*, No. 12-cv-1966, 2012 WL 12885707, at *2 (C.D. Cal. June 13, 2012).

irreparable harm . . . intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (holding that a company's "loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm").

Given the very nature of a trade secret, the Ninth Circuit has recognized that "[o]nce a trade secret is enabled to fly from its oubliette, it cannot be recaptured. Once lost, it is lost forever. The harm is irreparable." *Beckman Instruments, Inc. v. Cincom Sys., Inc.*, 165 F.3d 914, 1998 WL 783774, at *2 (9th Cir. 1998), *amended on denial of reh'g* (Dec. 4, 1998). Thus, the Ninth Circuit routinely has upheld a finding of irreparable harm where a party faces a risk of loss of a trade secret. *See, e.g.*, *Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, No. 20-CV-72-RJC-CLB, 2020 WL 1433525, at *5 (D. Nev. Mar. 23, 2020), *aff'd*, 836 F. App'x 531, 533 (9th Cir. 2020) (finding of irreparable harm sustained where device manufacturer faced risk that former employees would use its internal marketing strategies, product information, and customer list); *Softketeers, Inc. v. Regal W. Corp.*, No. 19-cv-519-JVS-JDEx, 2019 WL 4418819, at *10 (C.D. Cal. May 6, 2019), *aff'd in relevant part, remanded in part on other grounds*, 788 F. App'x 468 (9th Cir. 2019) (finding of irreparable harm upheld where software company faced risk that former employee would disclose its source code).[4]

Here, too, Pfizer will suffer irreparable harm absent a TRO or preliminary injunction because it would otherwise lose the value of the Trade Secrets forever—a loss that cannot be quantified—if they were disclosed to a third party, let alone to a competitor such as Xencor. Indeed, the Pfizer Trade Secrets would give a

---

[4] In entering into the Confidentiality Agreement, Ms. Li agreed that "any breach of any of my obligations under this Agreement" would "cause irreparable harm" to Pfizer. Ex. 3 ¶ 8. Such an agreement can be evidence of irreparable injury. *See Int'l Ass'n of Plumbing & Mech. Officials v. Int'l Conference of Bldg. Officials*, No. 95–55944, 1996 WL 117447, at *2 n.3 (9th Cir. Mar. 15, 1996).

19

competitor insight into how to follow Pfizer's path to COVID-19 vaccine success, along with strategies for how to replicate Pfizer's monoclonal antibody programs. *See* Meyer Decl. ¶¶ 15-20.  For example, the Clinical Development Plan would allow a competitor to build a similar research and development pipeline for combining monoclonal antibodies, employ the same target product profiles, and use the same strategies and timelines.  *See generally* Ex. 5.  And the E2E Submissions Playbook would provide a competitor with blueprints on how to execute clinical development and regulatory submissions with the same speed and precision Pfizer did with respect to its COVID-19 vaccine studies.  Ex. 3.  If Xencor or another competitor is able to supplant Pfizer's market position as a result of Ms. Li's misappropriation, Pfizer will not be able to restore its reputation or goodwill to the positions they were in before her theft.  *Id.*

Nor is the risk of disclosure speculative.  Ms. Li's statements and conduct to date indicate that she wishes to use the Pfizer Trade Secrets for her own benefit— so much so that she attempted to deceive Pfizer by providing a decoy laptop and deleting documents from her external hard drive.  *See* Clark Decl. ¶¶ 14–18.  And moreover, in light of her refusal to meet with Pfizer again, Smith Decl. ¶ 12, Pfizer is unable to take any reasonable measures to protect against disclosure of the Pfizer Trade Secrets, such as inspecting Ms. Li's remaining accounts and devices and quarantining any Pfizer files that may reside within.

## C.   The Balance of Hardships Tips Decidedly in Pfizer's Favor

The balance of hardships here strongly favors Pfizer.  Ms. Li will suffer minimal harm if Pfizer's request is granted: she will only have to refrain from committing trade-secret misappropriation and destroying evidence, as well as endure some modest personal inconvenience in making her devices and accounts available for forensic review.  Pfizer will ensure that Ms. Li's personal information is handled with utmost care and will only be accessible to Pfizer's outside counsel and outside forensics firm.  On the other hand, if the Court denies Pfizer's request

for a preliminary injunction, the harm to Pfizer will be immense: the loss of its most valuable Trade Secrets and considerable damage to its reputation as the market leader in next-generation vaccines and monoclonal antibody drugs. *See, e.g.*, *Petraglia*, 2020 WL 209103, at *8 (finding plaintiff's risk of "lost value of its trade secrets" outweighed any harm to former employees temporarily enjoined from using, accessing, or copying plaintiff trade secrets in their possession).

### D.   The Public Interest Favors Issuance of a Preliminary Injunction

The final factor, the public interest, also weighs heavily in favor of the requested injunctive relief. *See Corbett*, 2018 WL 4951966, at *8 ("The public interest is served when [a] defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer. Public interest is also served by enabling the protection of trade secrets."). In light of the ongoing COVID-19 pandemic and the material impact Pfizer's vaccine has had in combating the virus, preservation of the Pfizer Trade Secrets and Pfizer's ability to continue unimpeded with its efforts indisputably furthers the public interest. If Pfizer is unable to safeguard against disclosure of the most sensitive aspects of its vaccine and drug programs, then it may not be able to complete future work that promises to save millions of lives. *See Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 20-CV-10488, 2020 WL 7778037 (S.D.N.Y. Dec. 30, 2020) (finding public interest weighed in favor of enjoining application of regulation, which plaintiff argued would "risk restricting medical innovation and limiting Americans' access to new prescription drugs").

### E.   The Relief Requested Preserves the Status Quo

As set forth in Pfizer's proposed order that accompanies its Motion, Pfizer requests not only that Ms. Li be enjoined from using or disclosing Pfizer's confidential information and destroying evidence, but also that she be ordered to provide Pfizer's outside counsel with attorneys-eyes-only access to her personal Google Drive account and any other relevant account or device. Such relief is

essential to preserve the status quo, particularly in light of Ms. Li's refusal to disclose her employer, provision of a decoy laptop, and deletion of hundreds of files from her external hard drive before turning it over to Pfizer.  *See* Clark Decl. ¶¶ 14–18.  Unless Ms. Li turns over her devices and accounts, Pfizer cannot determine the full extent of her misappropriation or ensure that she does not use or disclose its trade secrets.  *See Petraglia*, 2020 WL 209103, at *9–10 (enjoining defendants from "accessing, copying, or using any of [plaintiff's] documents" and requiring defendants to "***return*** to [plaintiff] any external drives or USB storage devices that contain [plaintiff's] documents" (emphasis added)); *Allstate Ins. Co. v. Rote*, No. 16-cv-01432, 2016 WL 4191015, at *7 (D. Or. Aug. 7, 2016) (granting preliminary injunction ordering employee to return confidential information to former employer).

## IV.  A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED *EX PARTE* WITHOUT NOTICE

As set forth in the Declaration of Ashok Ramani accompanying this Motion, Pfizer submits that the requested TRO should be granted *ex parte* without notice to Ms. Li.  Courts may issue such relief if: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1); *see also* S.D. Cal. Civ. R. 83.3(g)(2) (providing that "[a] motion . . . must not be made *ex parte* unless it appears by affidavit or declaration . . . that for reasons specified the party should not be required to inform the opposing party").  Pfizer satisfies these requirements.

Ms. Li's deceptive conduct and interference with Pfizer's internal investigation demonstrate the very material risk that she is willing to take additional steps to cover her tracks.  If Ms. Li were provided notice of this Motion,

there would be nothing to stop her from deleting additional documents or disposing of accounts or devices—just as she deleted hundreds of documents from her external hard drive before turning over to Pfizer for forensic inspection.  Ramani Decl. ¶ 9.  Moreover, to this day, there is reason to believe that Ms. Li retains the personal laptop that she used to upload 12,000 files that include Pfizer confidential information to her personal Google Drive account—a laptop that she avoided relinquishing by providing a decoy device in its stead to Pfizer.  *Id.*  Temporary *ex parte* relief is therefore necessary to prevent further harm to Pfizer and to prevent Ms. Li from destroying evidence.  *See Shutterfly, Inc. v. ForeverArts, Inc.*, No. 12-cv-3671, 2012 WL 2911887, at \*4 (N.D. Cal. July 13, 2012) (granting TRO *ex parte* where "defendant ignored signed obligations regarding the [source] code at issue" and the existence of a "duplicate Chinese website suggests that defendants may be able to use the code to the injury of plaintiff even if it is destroyed [in the United States]," and enjoining defendants from "destroying any current or archived electronic logs, metadata, and directories . . . as well as any emails and electronic documents that relate to [plaintiff]").

## V.   CONCLUSION

For the above reasons, Pfizer respectfully requests that the Court grant Pfizer's motion and enter a temporary restraining order and preliminary injunction that:

(a)   Enjoins Ms. Li from further using, disclosing, or transmitting Pfizer's confidential information or trade secrets;

(b)   Enjoins Ms. Li from destroying, manipulating, or otherwise altering any of Pfizer's confidential information and trade secrets in her possession, including any electronic information such as metadata that shows last access-date and creation date; and

(c)   Directs Ms. Li to provide Pfizer's outside counsel with attorneys-eyes-only access to (i) her personal Google Drive account(s), (ii) any

23

and all computing devices in her possession, custody, and control, and (iii) to any other account or device on which she may have stored Pfizer's confidential information or trade secrets, as well as to return any hard copy documents containing Pfizer's confidential information or trade secrets.

November 23, 2021

Respectfully submitted,

*s/ Ashok Ramani*

Ashok Ramani (SBN 200020)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Tel:  (650) 752-2000
Fax:  (650) 752-2111
ashok.ramani@davispolk.com

Dana M. Seshens (NY SBN 4148128)
 (*pro hac vice application forthcoming*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:  (212) 450-4000
Fax:  (212) 701-5800
dana.seshens@davispolk.com

*Attorneys for Plaintiff Pfizer Inc.*